[Civ. No. 3532.   Third Appellate District.—September 19, 1928.]

LOVICA NELSON et al., Appellants, v. S. A. MYERS, Respondent.

William P. O'Connor, Bertrand J. Wellman and Perky, McConnell & Hill for Appellants.

Scott McReynolds and Clarke & Bowker for Respondent.

THOMPSON (R. L.), J., *pro tem.*—This is an appeal from the verdict of a jury in favor of the defendant in an action against the landlord of an apartment house, for the death of a subtenant resulting from asphyxiation caused by a defective automatic gas heater which was used in a bathroom.

The respondent owned the Sunnyside Apartments at Ventura, which were leased November 8, 1923, to Nannie Swanwick. The lease contained the following clause: "The lessee agrees to make all minor repairs at her own expense." Appellants' intestate, Arthur P. Nelson, and his family were tenants of the lessee at the time of his death. He was a strong, healthy man forty years of age, and was engaged as an oil driller. A few days prior to his death, the deceased wrenched his back in attempting to adjust an automobile wheel, and did not return to his work. The night before his death he was taken to a physician for treatment, but the record fails to disclose the nature or seriousness of this ailment. The afternoon of July 13, 1924, Mrs. Swanwick assisted him in ascending the stairway to his room, She testified: "He came in and sat down on a couch in the hall, . . . then . . . he went upstairs. . . . I walked by the side of him—I went with him. Q. Did you help him upstairs? A. Yes, sir, . . . He seemed a little

weak; his back hurt him a little.'' Later in the day she saw him in the hallway upstairs, coming from the bathroom. He was weak and she again assisted him to his room and took off his shoes. She said: ''He complained a little bit of his back, and he was weak. . . . I think I took off his shoes. Q. What did he (then) do? A. He lay down. . . . He said he wanted to go to work. . . . He put his hand to his back and said, 'I guess I won't; maybe I'm hurt a little more than I think I am.' '' That night Arthur Nelson was found dead in the bathtub. The appellants allege that the deceased met his death from carbon monoxide which escaped from the automatic gas heater used in the bathroom; that this heater contained a latent defect consisting of a loose disconnected vent-pipe extending from the top of the heater to an aperture in the ceiling, provided for the purpose of carrying off the noxious gases generated by imperfect combustion. From the evidence it appears that the apparatus complained of was a Humphrey heater which was installed in the bathroom of the Sunnyside Apartments several years before the accident by Mrs. Baldwin, a former lessee of the premises; that it was a model of gas heater in common use at that time, consisting of coils and burners inclosed in a metal case, stationed upon brackets in the bathroom. On the top of the heater there was a cap in the center of which there was an opening surrounded with an iron collar, over which a galvanized iron pipe fitted, extending through an aperture in the ceiling to carry off the poisonous gases. This heater was two and a half feet in height and fourteen inches in diameter. Both the heater and the vent-pipe were in plain view of any occupant of the bathroom, and their purpose was within the common knowledge of all. The lessee and her renters, including the deceased, were familiar with this gas heater and knew that it had previously caused some trouble in operation. Mrs. Swanwick had talked with the deceased about it. There is a sharp conflict as to whether the respondent knew that it was claimed this particular gas heater was defective or dangerous. Mrs. Swanwick and other witnesses testified that they notified respondent of the danger of using this heater. Mr. Sly, a building inspector, claimed that on December 6, 1923, he served respondent with a written notice that, ''The heaters

at Sunnyside Apartments are found to be in a very dangerous condition. Repairs are requested at your earliest convenience, as I have this date notified the parties to discontinue the use of the same until repairs can be made." The respondent emphatically denied the receipt of this written notice, but admitted that Mr. Sly orally notified him of danger from fire which might be caused by another heater which was situated on the floor above the bathroom where the accident occurred. He claimed that Mrs. Swanwick complained only of the gas heaters in general, because they failed to heat the bath water with sufficient speed or quantity to efficiently serve their needs, and urged him to install a large heater in the basement which she argued would supply all the bathrooms in the house better and at less expense than the old ones. This he promised to do, and ordered the new heater shortly before the accident occurred, but it was not actually installed until afterward. The respondent denied that it was his responsibility to keep the heaters in repair, yet it appears that on several previous occasions when the lessee complained to him about them, he promptly sent an expert to adjust them. Mr. Johnson, with twenty-five years of experience as a plumber, who was acting as deputy building inspector for his principal who had succeeded Mr. Sly in that capacity, testified that at the request of respondent he visited Sunnyside Apartments December 8, 1923, and June 30, 1924, and found an accumulation of rust and foreign substance about the burners, and the screen rusted out. This prevented the obtaining of sufficient oxygen for proper combustion of the gas. He replaced the screen, cleaned the burners, lit the gas and experimented with the heater, saying: "We tested it out for half an hour and found that it burned perfectly." He declared that the heater was in good condition, but that it had been neglected. Mr. Leach, a friend of the respondent, testified that upon one of these occasions when Mr. Myers was away, Mrs. Swanwick phoned to him that the gas heater had blown up and that she wanted a plumber. He promptly summoned Mr. Johnson and they went to the apartments but found nothing wrong with the heater except that the vent-pipe had been displaced by the explosion of the gas. This pipe was promptly adjusted, and the heater was tested and found

to be all right. He said that Mrs. Swanwick told them that a renter had turned on the gas, and finding that he was without a match to light it, returned to his room to get one. In attempting to ignite the gas upon his return to the bathroom an explosion occurred, dislodging the pipe. Mr. Johnson testified that it was a simple matter to replace the pipe, which they speedily did, and found that the heater worked in good condition. He was asked, "Would this blowing off of the vent indicate a defective heater?" To which he replied, "No, . . . it would indicate carelessness on the part of the operator." Johnson instructed the lessee how to keep the burners and screens clean and free from corrosion and dirt.

Owing to the evidence of the ailment from which the deceased was suffering immediately prior to the time when his body was found in the bathroom, there may be a serious doubt as to whether the jury believed that he died from the effects of carbon monoxide. The record fails to indicate whether the physicians who participated in the post-mortem examination had any knowledge of his previous ailment, or whether they examined the body with any object in view except to ascertain whether he had died from the effects of carbon monoxide. In this examination no spectroscope was used, and no chemical analysis of the blood was made. The skin of the deceased was found to be ruddy, his blood retained a cherry-red appearance and his features were composed, indicating that death was accompanied with no severe pain. From these symptoms it was assumed that death resulted from inhaling carbon monoxide, which is composed of equal parts of carbon and oxygen, one-half of one per cent of which, mingled with air, will usually produce giddiness, unconsciousness, and painless speedy death. It is an odorless, colorless, deadly poison, one hundred times the density of air, and burns with a lambent blue flame. It causes death by combining its noxious property with the haemoglobin of the blood, thereby destroying the efficiency of that fluid as an oxygen carrying medium, stifling the victim. Dr. Stookey, however, testified that he was reasonably certain that the deceased died from the inhaling of carbon monoxide. Dr. Bianchi testified that, while the autopsy was unsatisfactory, and there was a possibility of

death having resulted from other causes, judging from the peculiar appearance of the blood and muscles, viewed in the light of the circumstances surrounding his death, it was his belief that Nelson died from the result of the presence of carbon monoxide. But, assuming that the record satisfactorily established the cause of death as a result of inhaling carbon monoxide, we are still of the opinion that the liability of the respondent has not been shown, and that the motion for nonsuit should have been granted.

As a proximate cause of death the appellants relied upon their theory that the ventilating pipe which was intended to connect the gas heater with the aperture in the ceiling and thus convey the noxious gases into the outer air, had been displaced so as to discharge the poison into the bathroom. The complaint alleged that "there existed on the water heater . . . a vent pipe . . . intended to collect said noxious gases . . . and convey the same into a flue (communicating) with the outside air . . . That said water heater and gas flame were in a bad state of repair and dangerous in this, that the said vent-pipe had become disconnected and . . . conveyed the said noxious and deadly gases so generated by said gas flame and discharged the same into said bathroom." The appellants utterly failed to prove the displacement of this vent-pipe at the time of the accident. There is no evidence in the record that the vent-pipe was found disconnected, or even that the gas heater was found lighted when the body of the deceased was discovered. Upon the contrary, there is evidence that the transom over the bathroom door was found to be open a few inches, and there was no evidence of the odor of gas in the room. The total failure to prove the proximate cause of death as alleged and relied upon by the appellants is fatal to their cause. In 20 Standard Encyclopedia of Procedure, 322, it is said: "A variance between the allegations of the complaint, and the proof as to the proximate cause of the injury is fatal." Certainly a substantial and material variance in that regard will defeat the recovery of a complainant. The jury may not be permitted to speculate as to the producing cause of death. (19 Cal. Jur. 696, sec. 118; *Puckhaber* v. *Southern Pac. Co.*, 132 Cal. 363 [64 Pac. 480]; *Hopkins* v. *Heller*, 59 Cal. App. 447 [210 Pac. 975].)

The respondent sufficiently pleaded and relied upon the defense of contributory negligence on the part of the deceased. Both the lessee and the deceased were familiar with the alleged defects of the gas heater. Mrs. Swanwick had talked to the deceased about it. He was employed regularly as an oil-well driller, and must be presumed to have been familiar with the danger of noxious fumes incident to the improper combustion of gas. ■ Neither the gas heater nor the alleged disconnected vent-pipe may be deemed to be latent or hidden dangers under the facts of this case. The condition of both was open and visible to any occupant of the bathroom. A casual glance at the pipe would have revealed the defect, if it had been misplaced. Moreover, the evidence discloses the fact that in spite of the knowledge of the deceased with respect to the alleged defects of the gas heater, he entered and used the bathroom in darkness, for Mrs. Swanwick testified that the electric light globe in the bathroom had burned out prior to the accident, and that she had failed to replace it. With the bathroom lighted, and with the exercise of ordinary care, the defect of a misplaced vent-pipe would have been discovered. ■ These circumstances strongly indicate contributory negligence on the part of the deceased. ■ The contributory negligence of a tenant will bar his recovery for injuries sustained from defects of which he has knowledge. (16 R. C. L. 1049, sec. 568.) ■ Contributory negligence is ordinarily a matter to be determined by the jury. (1 Thompson on Negligence, p. 408, sec. 425; 29 Cyc. 631; *Kelly* v. *Santa Barbara R. R. Co.*, 171 Cal. 423 [Ann. Cas. 1917C, 67, 153 Pac. 903]; *Hoffman* v. *Southern Pac. Co.*, 84 Cal. App. 337 [258 Pac. 397]; *Phillips* v. *Pacific Elec. Ry. Co.*, 89 Cal. App. 122 [264 Pac. 538].) In 16 Ruling Case Law, 1058, it is said: "It has been held that (the question as to) whether the tenant is guilty of contributory negligence in using the premises after the need for repairs becomes apparent is a question for the jury." ■ By their verdict in the present case the jury is presumed to have found that the deceased was guilty of contributory negligence. Where there is any substantial evidence to support this finding it will be upheld on appeal.

██ The chief contention of the appellant in this case is that the respondent as the landlord of Sunnyside Apartments is liable for damages resulting to a tenant from defects of a gas heater used as a part of the equipment of the rented premises, particularly since he assumed the responsibility of repairing such defects. It is doubtful whether the respondent was required to clean or repair the gas heater under the covenants of the lease which provided, "The *lessee* agrees to make all *minor repairs* at his own expense." Cleaning the gas burners, replacing the screen, or adjusting the vent-pipe appear to be "minor repairs" which could be done with little labor at small expense. When such minor repairs cost less than one month's rent of the premises, the lessee is authorized to make the repairs and charge the expense against his rent account. (Civ. Code, sec. 1942.) When the defects are trivial, and the cost of repairing them amounts to less than one month's rent of the premises, regardless of a landlord's covenant to repair, the only remedy which the lessee has for the landlord's failure to repair is to either vacate the premises or make the repairs and charge the expense to the rent account pursuant to section 1942 of the Civil Code. ██ It is the settled law of this state that in the absence of fraud or deceit on the part of the landlord in concealing latent defects of which he has knowledge, and in the absence of a direct covenant to make repairs, the lessor is not liable to the tenant or others for injuries resulting from defects in the rented premises. (15 Cal. Jur. 704; 16 R. C. L. 1059, sec. 580; 1 Tiffany on Landlord and Tenant, 556, secs. 86, 87; *Carty* v. *Blauth,* 169 Cal. 713, 716 [147 Pac. 949] ; *Gately* v. *Campbell,* 124 Cal. 520 [57 Pac. 567] ; *Daley* v. *Quick,* 99 Cal. 179 [33 Pac. 859] ; *De Motte* v. *Arkell,* 77 Cal. App. 610, 621 [247 Pac. 254] ; *Hassell* v. *Denning,* 84 Cal. App. 479 [258 Pac. 426] ; *Smelser* v. *Deutsche etc. Kirche,* 88 Cal. App. 469 [263 Pac. 838].)
██ A landlord is not an insurer of his demised premises against damages or injuries. He becomes liable for injuries or damages only when his conduct amounts to fraud or deceit, such as a failure to disclose the existence of hidden defects of which he has knowledge, and which may not be discovered by the use of reasonable diligence on the part of the lessee. The doctrine of *caveat emptor* ordinarily ap-

plies to the leasing of premises. It is the duty of the renter to exercise reasonable care and diligence in inspecting the premises which he proposes to rent. ▮ Even when the landlord has covenanted to repair defects, or is guilty of constructive fraud in concealing hidden defects of which he has knowledge, the lessee may not recover damages when his own negligence proximately contributed to the injuries sustained.

▮ It is true that a landlord who voluntarily attempts to repair defective premises, whether he has contracted to do so or not, will be required by law to exercise reasonable care therein, and will become liable for injuries caused by his careless or unskilful workmanship. (1 Tiffany on Landlord and Tenant, p. 608, sec. 87; 16 R. C. L. 1045, sec. 565; 36 C. J. 217, sec. 900; *Callahan* v. *Loughran*, 102 Cal. 476 [36 Pac. 835]; *Seid Pak Sing* v. *Barker*, 197 Cal. 321, 355 [240 Pac. 765].) ▮ But in the present case, while it is true that the respondent did send his agent to repair or clean the gas heater upon several occasions, there is no evidence of unskilful or careless workmanship on their part which would make him liable. The record contains substantial evidence from which the jury was warranted in determining just the contrary. The foregoing exception to the rule respecting the liability of a landlord for injuries sustained from defective premises is therefore not applicable.

▮ The appellants seek a reversal of the judgment for the alleged erroneous giving and refusing of certain instructions. The following instruction was refused: "The defendant having undertaken to repair the heater in question, was bound to exercise reasonable care in the repair and replacement of the same to make it safe, . . . " This was a correct statement of the law, but was fully covered by appellants' instruction number 11, which was given as follows: "If, when defendant leased the premises to Mrs. Swanwick, the said heater was in a dangerous and unsafe condition, and if following that he undertook to repair the same under his lease, then he was bound to exercise reasonable care to make the same safe for the uses for which it was intended, and if he negligently failed to do so, and because thereof the deceased met his death, without contributory negligence on the part of the deceased, then your verdict will be for the

plaintiff. . . . '' ▇ Defendant's instructions numbers 18 and 22 are challenged because they omitted to inform the jury that the law requires a renter to use only ordinary care to discover the defects which resulted in his injury. Number 18 reads: ''I instruct you . . . that even if the water heater was in a bad state of repair and known to be so by the defendant, and that he negligently failed to repair it, still if the defect was one that was clearly patent, open, and observable by the deceased or anyone using the bathroom, then the law charges the deceased with knowledge of the danger, and the defendant cannot be held responsible for such defect.'' Instruction number 22 reads: ''I further instruct you that if you believe that the said Albert P. Nelson knew of the defective condition of the heater, if it was defective, and that he thereafter used the same, that he thereby assumed the risk of such defective condition so far as it was known to him.'' The omitted element of these instructions to the effect that the deceased was liable only for a failure to use reasonable care for his own safety, was supplied by instruction number 13, which was given as follows: ''If the defendant was negligent as charged in the complaint, the fact that the deceased may have known there was some danger in entering the bathroom will not, in and of itself defeat the plaintiff's right to recovery, *but you must find that a reasonably careful person would not have entered the bathroom under like circumstances, and with the same knowledge he had of the danger.*'' In this regard, the jury was further instructed: ''The test is, did the deceased do what a reasonably careful person would have done under the same situation, facts and circumstances, viewing it as the deceased did, . . . '' These instructions were further supplemented by informing the jury in the language of the statute, that in the absence of an eye-witness to the accident which caused the death of the deceased, the law presumes that he exercised due caution for his own safety, and that the burden was upon the defendant to show his lack of ordinary care. These instructions, taken as a whole, fairly informed the jury that the deceased was required to exercise only ordinary care for his own safety, and that the burden rested upon the defendant to prove a lack of such diligence. ▇ The deceased was entitled to the benefit

of the legal presumption that he exercised due diligence for his own safety, to be weighed by the jury as an established fact, together with all the other evidence in the case in determining whether he was guilty of negligence. The appellant contends that this presumption was controlling and that it absolutely refutes the theory that he was guilty of contributory negligence. There was, however, substantial evidence of his negligence, which was a matter solely for the jury to determine. He knew of the alleged defective condition of the heater. Mrs. Swanwick testified that she had discussed it with him about a week before his death. "Q. You had some discussion with Mr. Nelson about the condition of the heater? A. Yes, sir. Q. When was that? . . . A. I would judge a week or more . . . before his death." The defect in the heater relied upon by appellants was the frequent displacement of the vent-pipe which carried off the noxious gases. In spite of his knowledge of the alleged defective condition of the heater, he entered the bathroom and apparently used this heater in the darkness, without an electric light. Mr. Reardon, the undertaker, testified: "Q. Now you may tell when it was, and where, that you saw him after his death. A. In the bathtub at Sunnyside Apartments. . . . It was just about dark, or just before dark, and there was no light in the room, so that you couldn't decipher the expression on his face."

Appellants also challenge defendant's instruction number 21, contending that there was no dispute as to the actual cause of death. This instruction reads: "If the jury believe from the evidence that it is impossible to ascertain what was the cause of the death of Mr. Nelson, then your verdict should be for the defendant." We are of the opinion that the appellants are in error regarding their claim that the cause of death was not disputed. The answer "denies that the said Arthur P. Nelson then and there died as a result of breathing said noxious or deadly gases, or as a proximate result of the negligence of the defendant." It is true that the weight of the evidence indicates that he died as a result of inhaling carbon monoxide. But there was evidence of an ailment from which he suffered just before his death. The autopsy was not concluded with the use of a spectroscope, or aided by a chemical analysis of the

blood. The jury had a right to consider these circumstances in determining the cause of death. It is proper to give instructions upon any valid theory which is made an issue either by the pleadings or the trial of the case. This instruction was therefore proper. The appellants also complain of the giving of defendant's instructions numbers 23, 24, and 26, on account of their omission of the principle of law heretofore announced to the effect that when a landlord voluntarily undertakes to make repairs of defects, he will be held liable for negligence or carelessness in the workmanship which causes the injury to the renter. We are of the opinion that instruction number 11, which was given, and which was heretofore quoted, sufficiently covers this feature of the law. The jury was fully and fairly instructed upon the doctrines of negligence and contributory negligence in their application to the relationship of landlord and tenant, and we think the record is free from reversible error.

The judgment is therefore affirmed.

Plummer, J., and Finch, P. J., concurred.